WO                                                                                                                    JDN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Donald Ray Palmer, | No. CV 12-08214-PCT-SPL (MHB) |
| Plaintiff, | |
| vs. | **ORDER** |
| Wexford Medical, et al., | |
| Defendants. | |

Plaintiff Donald Ray Palmer brought this pro se civil rights action under 42 U.S.C. § 1983 against Charles L. Ryan, Arizona Department of Corrections (ADC) Director, and Elise Stowell, former complex manager for Wexford Health, the health care company contracted to provide medical services to prisoners (Doc. 1). Before the Court are Ryan's and Stowell's separate Motions for Summary Judgment (Docs. 59, 61).

The Court will grant the motions and terminate the action.

**I.   Background**

Palmer's claims arose during his confinement at the Arizona State Prison Complex (ASPC)—Winslow, Kaibab North Unit (Doc. 11). Palmer alleged that he suffers from serious knee injuries that cause unbearable pain and limit his ability to walk and navigate the hilly terrain of the Winslow Complex. Palmer averred that he requested, and his doctor supported, a transfer to another complex with flat terrain and handicap access. According to Palmer, to receive the transfer, he was told that he would have to cancel a

pending appointment with an outside specialist and resume treatment after his move. Palmer states he canceled the appointment and requested a transfer.

In Count I of his First Amended Complaint, Palmer alleged that Stowell acted with deliberate indifference to his medical needs when she denied his transfer to a new unit and refused to reschedule his appointment with the specialist (*id.* at 3-3C). In Count II, Palmer claimed that Ryan acted with deliberate indifference when he, too, denied Palmer's request for a transfer and his request to reschedule his appointment with the specialist (*id.* at 4-4B).

Palmer stated that as a result of Defendants' actions, he suffers extreme pain that is aggravated by the difficult terrain at the Winslow Complex and the lack of handicap accessible facilities (*id.*). He requested money damages and injunctive relief (*id.* at 6).

Stowell moves for summary judgment on the grounds that (1) Palmer cannot show he suffered a deprivation or harm serious enough to implicate the Eighth Amendment, (2) Stowell did not act with deliberate indifference, (3) Palmer is not entitled to punitive damages, and (4) Palmer's claims for declaratory and injunctive relief should be dismissed (Doc. 61)

Ryan argues that he is entitled to summary judgment on the grounds that (1) he was not deliberately indifferent to Palmer's medical needs, (2) the Eleventh Amendment bars Palmer's damages claim against Ryan in his official capacity, (3) claims for declaratory or injunctive relief against Ryan in his individual capacity are not appropriate, (4) Palmer's claim for punitive damages is misplaced, and (5) Ryan is entitled to qualified immunity (Doc. 59).[1]

## II.   Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[1] The Court issued a Notice, required under *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998), informing Palmer of his obligation to respond to the summary judgment motions and the requirements under Federal Rule of Civil Procedure 56 (Doc. 63).

of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III. Relevant Facts

The relevant facts, most of which are undisputed, are taken from the parties' separate Statements of Facts and attached exhibits (Doc. 60, Ryan's Statement of Facts

(RSOF); Doc. 62, Stowell's Statement of Facts (SSOF); Doc. 71 at 24-27 (PSOF)[2]).

In 2010, Palmer injured his knee playing basketball at the Lewis Complex, and, on November 10, 2010, he saw a prison physician to address pain resulting from the injury (PSOF ¶ 3;[3] RSOF ¶ 13; SSOF ¶ 5). He was seen again on October 25, 2011, for complaints of ongoing pain; Dr. Merchant, the prison physician, assessed Palmer with right knee instability, prescribed Ibuprofen, and ordered x-rays and an MRI (RSOF ¶¶ 14-15; SSOF ¶ 6). Also on this date, Palmer signed an inmate outside consultation appointment agreement (PSOF ¶ 5).

On January 23, 2012, an x-ray and an MRI were performed (PSOF ¶ 6; RSOF ¶¶ 16-17; SSOF ¶¶ 7-8). The x-ray showed no fracture or dislocation; however, the MRI revealed a complex tear in the lateral meniscus, a subacute bone bruise on the tibial plateau,[4] and small joint effusion (RSOF ¶¶ 16-17; SSOF ¶¶ 7-8).[5] On January 24, 2012, Palmer was issued a Special Needs Order (SNO), good for one year, for a large right knee sleeve (RSOF ¶ 18; SSOF ¶ 9). Two weeks later, Dr. Merchant met with Palmer and submitted a request for an orthopedic surgery consult (RSOF ¶ 19; SSOF ¶ 10).

---

[2] Ryan and Stowell both object to PSOF on the grounds that it does not comply with Local Rule of Civil Procedure 56.1(b) (Doc. 75 at 2-3; Doc. 73 at 2-3). Although the paragraphs within PSOF do not correspond to the numbered paragraphs in RSOF and SSOF, they set forth Palmer's factual assertions and are supported by the attached evidence. In light of Palmer's pro se status and the requirement to construe his pleadings liberally and afford him the benefit of any doubt, the Court overrules Defendants' objections and denies their requests to deem RSOF and SSOF admitted. *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (courts must "construe liberally motion papers and pleadings filed by pro se inmates and . . . avoid applying summary judgment rules strictly"); *Karim-Panahi v. L.A. Police Dep't*, 839 F.2d 621, 623 (9th Cir. 1988).

[3] Ryan objects to PSOF ¶ 3 on the grounds that it lacks foundation and mischaracterizes Dr. Macabuhay's November 10, 2010 medical note (Doc. 75 at 1). The objection is overruled. Palmer submits a copy of the medical note and he has personal knowledge to testify as to the reason he sought medical treatment.

[4] Subacute is "between acute and chronic; denoting the course of a disease of moderate duration or severity." Stedman's Medical Dictionary subacute (27th ed. 2000).

[5] Joint effusion is increased fluid in the cavity of a joint. Stedman's Medical Dictionary joint effusion (27th ed. 2000).

- 4 -

On May 29, 2012, Palmer was moved to the Winslow Complex (RSOF ¶ 20; SSOF ¶ 2; PSOF ¶ 1).

Two days after his transfer to Winslow, Palmer submitted a Health Needs Request (HNR) seeking medical attention for his knee; he stated that slopes and rocks on the Winslow yard make it too painful to get around and that the pain was extending from his knee to his toes and leg (RSOF ¶ 21; SSOF ¶ 11; PSOF ¶ 8). On June 5, 2012, Palmer saw a nurse practitioner, at which time he complained of sharp pain in his right knee, leg, and toes; swelling at night; and knee pain when he walks the uneven terrain (SSOF ¶¶ 12-13).

On June 12, 2012, Palmer complained of knee pain when walking and saw Dr. Gibula, who observed mild flexion/extension, no patellar tenderness, marked meniscus stress pain, and slight extension limit; Dr. Gibula diagnosed internal right knee derangement and he requested a referral for an orthopedic consult (*id.* ¶ 19; RSOF ¶ 23; PSOF ¶ 9[6]).

On June 14, 2012, Palmer submitted an inmate letter to Deputy Warden Pruett stating he had a real bad knee and was having trouble walking around the Kaibab Unit due to the slopes and uneven surface and stairs, and he requested to move to another yard (RSOF ¶ 24; PSOF ¶ 10).

On June 20, 2012, Dr. Gibula advised Palmer that he spoke with staff and was told Palmer could not be placed on another yard at the Winslow Complex; however, Palmer could be moved to another facility to have a level yard but, if he chose to transfer, his orthopedic appointment would be canceled and he would have to start that process over (RSOF ¶ 25; SSOF ¶ 21). Dr. Gibula instructed Palmer to let Dr. Gibula know if he wanted to move to another facility and skip the orthopedic appointment (RSOF ¶ 25; SSOF ¶ 22).

---

[6] Ryan objects to PSOF ¶ 9 on the grounds that it lacks foundation and mischaracterizes Dr. Gibula's medical note (Doc. 75 at 2). The objection is overruled. RSOF ¶ 23 does not dispute that Palmer complained about knee pain, and Palmer has personal knowledge to testify as to why he sought treatment and what he told Dr. Gibula.

On June 28, 2012, Palmer sent an inmate letter to Dr. Gibula stating that he would like to be moved and start the orthopedic consult process over (RSOF ¶ 26; SSOF ¶ 23; PSOF ¶ 15). Palmer sent a second inmate letter to Dr. Gibula on July 2, 2012, stating he wished to cancel the consult appointment and be moved (PSOF ¶ 16). And on July 5, 2012, Palmer submitted another inmate letter to Dr. Gibula stating that he signed a refusal for treatment that day canceling any further appointments for his knee, that he would like to be moved to a flat terrain yard, and that he wanted to be seen for his knee after transfer to the new unit (SSOF ¶ 25; PSOF ¶ 18). The refusal-for-treatment form indicated that the reason for refusal was "per doctor suggestion" (PSOF ¶ 17).

On July 16, 2012, Stowell issued a written response to Palmer's July 5, 2012 inmate letter (PSOF ¶ 19). She advised Palmer that being uncomfortable walking around the yard is not a medical need for a transfer and that all yards have stairs and slopes so it is not a reason to move him, and she stated that "[i]t is unfortunate that you canceled your appointment with Ortho but that is your choice" (*id.*; SSOF ¶ 29).

On August 8, 2012, Stowell issued another inmate letter response to Palmer advising him that he was scheduled to see the provider so this issue could be resolved and that many inmates have bad knees and feet but this was not a reason to move an inmate (SSOF ¶ 30).

On August 23, 2012, Palmer advised medical staff that he did not want surgical intervention to his knee; he just wanted a single-level yard (RSOF ¶ 32). Dr. Gibula explained to Palmer that he was advised he did not have authority to move an inmate (*id.*).

On August 30, 2012, Palmer submitted an inmate grievance appeal, in which he appealed Stowell's prior inmate letter response (PSOF ¶ 20). Stowell issued a written response to this appeal, dated September 11, 2012, stating that Dr. Gibula is a MD and is not aware of ADC policy and procedures; that inmates are not moved for reasons raised by Palmer; and that the information Dr. Gibula gave Palmer was incorrect (SSOF ¶ 36).

Meanwhile, on September 4, 2012, Dr. Gibula issued a written inmate letter response to Palmer stating that the ADC, according to the Facility Health Administrator, does not transfer inmates for the reason underlying Palmer's request for a transfer (*id.* ¶ 35).

On October 25, 2012, Palmer filed a final appeal to the Director to appeal Stowell's September 11, 2012 response (RSOF ¶ 50). In his appeal, Palmer alleged deliberate indifference on the part of staff for disregarding his knee injury when transferring him to the Winslow-Kaibab Unit and he complained that he did not see the orthopedic surgeon after the provider told him he had to cancel the appointment in order to move to another facility (*id.*).

On October 26, 2012, Palmer was seen by a nurse in response to his HNR seeking another knee sleeve because his current sleeve was stretched out (*id.* ¶¶ 37-38). On November 8, 2012, Dr. Gibula examined Palmer for his request for a new knee brace (*id.* ¶ 40; RSOF ¶ 35). The medical note from this visit documents that Palmer's knee had no edemas or effusions, but there was pain with attempted full extension; marked meniscus strain tenderness; and tibial tubercle pain upon standing (SSOF ¶¶ 41-43; RSOF ¶ 35). Dr. Gibula assessed him with chronic knee pain and prescribed Ibuprofen and a large knee brace (SSOF ¶¶ 43-44; RSOF ¶ 35).

On November 20, 2012, Palmer again saw Dr. Gibula, who documented some effusion on the right knee and ACL tension increased pain and assessed Palmer with chronic knee pain and recurrent edema (SSOF ¶¶ 46-47; RSOF ¶ 37). Palmer was issued an SNO for a knee sleeve in January 2013; the SNO expires in January 2029 (SSOF ¶¶ 48-49; RSOF ¶ 38).

On February 8, 2013, Jeffery Hood, an ADC Deputy Director, responded to Palmer's October 25, 2012 final appeal on Ryan's behalf (RSOF ¶ 50). Hood stated that after an investigation, it was determined that Palmer's medical records did not reflect any medical issues that should have prevented his transfer to the Kaibab Unit (*id.*). Hood further stated that the provider, Dr. Gibula, incorrectly implied that he could move

1  Palmer to another facility and that Palmer should cancel his orthopedic appointment (*id.*).
2  For this reason, the appeal was partially upheld, and it was directed that Palmer be seen
3  by the medical provider within 30 days, at no charge, to determine if a new orthopedic
4  evaluation is necessary at this time (*id.*).

5  On February 14, 2013, Palmer was seen by a nurse practitioner for an orthopedic
6  complaint (*id.* ¶ 49). The nurse practitioner documented no edema or erythema (redness)
7  and assessed Palmer with right knee pain and medial ligament tear (SSOF ¶ 52; RSOF
8  ¶ 39). The treatment plan called for a prescription of Naproxen, muscle exercises, and
9  follow up in four weeks (SSOF ¶ 53; RSOF ¶ 39).

10  Palmer was seen by the nurse practitioner for follow up on March 14, 2013, at
11  which time his knee had pain and was unstable, there was trace edema, and there was
12  decreased range of motion (SSOF ¶¶ 54-55; RSOF ¶ 40). He was assessed with medial
13  ligament tear, arthritis, and knee instability; Meloxicam was prescribed in place of the
14  Naproxen; and an orthopedic consult was requested (SSOF ¶¶ 56-57; RSOF ¶ 40).

15  On May 5, 2013, Palmer had an MRI, which revealed degenerative arthropathy
16  most pronounced at the medial femorotibial joint space, a complex degenerative tear of
17  the medial meniscus, an extensive edema in the anterior cruciate ligament and a partial
18  tear, and small effusion with synovitis (RSOF ¶ 41). A few days later, a consultation
19  request was submitted requesting an orthopedic consult for Palmer's right medial
20  ligament tear (*id.* ¶ 42; SSOF ¶ 59).

21  In June 2013, Palmer saw an orthopedic specialist, who recommended right knee
22  arthroscopy, ice daily, activity modifications, and Motrin (RSOF ¶ 43). Palmer
23  underwent surgery on his right knee on July 18, 2013 (*id.* ¶ 45; SSOF ¶ 61).

24  In August, Palmer submitted an HNR informing medical staff that he still
25  experienced pain in his knee and that it was hard to walk (Doc. 71 at 11). On February 4,
26  2014, Palmer was issued a cane (*id.*).

27
28

In April 2014, Palmer was transferred to the Arizona State Prison Complex-Eyman, Special Management Unit 1 (Doc. 64).[7]

**IV.  Governing Standard**

Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard.  First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted).  A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted).  Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent.  *Jett*, 439 F.3d at 1096.  The state of mind required for deliberate indifference is subjective recklessness; however, the standard is "less stringent in cases involving a prisoner's medical needs . . . because 'the State's responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" *McGuckin*, 974 F.2d at 1060 (quoting *Hudson v. McMillian*, 503 U.S.1, 6 (1992)).  Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact, and a fact finder may conclude that a defendant knew of a substantial risk based on the fact that the risk was obvious.  *Farmer v. Brennan*, 511 U.S. 825, 842

---

[7] Palmer's surgery and subsequent transfer to a different facility effectively moot his claims for injunctive relief.  *See Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995).

- 9 -

(1994).  While the obviousness of the risk is not conclusive, a defendant cannot escape liability if the evidence shows that the defendant merely refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true.  *Id.*

"Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment."  *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted).  Deliberate indifference may also be shown by the way in which prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm."  *Lolli v. Cnty. of Orange*, 351 F.3d 410, 421 (9th Cir. 2003).  And deliberate indifference may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need.  *Jett*, 439 F.3d at 1096.  But the deliberate-indifference doctrine is limited; an inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim.  *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted).  Further, a mere difference in medical opinion does not establish deliberate indifference.  *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Finally, even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference.  *Jett*, 439 F.3d at 1096; *see Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

**V.     Discussion**

     **A.     Serious Medical Need**

Ryan does not challenge that Palmer's knee condition constituted a serious medical need (*see* Doc. 59).  But Stowell argues that Palmer cannot satisfy this initial element in deliberate-indifference analysis because Stowell followed Wexford and ADC policies when determining there was no basis for transferring Palmer (Doc. 61 at 10).

1 This argument does not relate to the objective element and whether Palmer's condition
2 constituted a serious medical need. Stowell also argues that Palmer cannot show that the
3 failure to transfer him to another facility resulted in further injury (*id.* at 9-10). As stated,
4 a serious medical need exists where a reasonable doctor finds a condition worthy of
5 treatment, the condition significantly affects an individual's daily activities, or the
6 condition causes chronic and substantial pain. *McGuckin*, 974 F.2d at 1059-60. The
7 evidence documents ongoing treatment and medications that prison medical staff and
8 specialists provided to Palmer, and he avers he suffered chronic pain that affected his
9 daily activities. On this record, a jury could find that Palmer's condition constituted a
10 serious medical need. The Court therefore turns to the subjective prong of the deliberate-
11 indifference analysis.

### B. Deliberate Indifference

When a plaintiff seeks to hold an individual defendant personally liable for damages, the causation inquiry between the deliberate indifference and the Eighth Amendment deprivation requires a very individualized approach that accounts for the duties, discretion, and means of each defendant. *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). The Court must look at "whether [each] individual defendant was in a position to take steps to avert the [incident], but failed to do so intentionally or with deliberate indifference." *Id.*

#### 1. Stowell

Stowell argues that the failure to transfer Palmer to a different facility did not amount to deliberate indifference because there is no constitutional right to be housed in a certain facility and he was receiving the necessary care for his knee at the Winslow facility (Doc. 61 at 9-10). She further argues that there is no evidence the failure to transfer Palmer resulted in further significant injury, as required under the Eighth Amendment (*id.* at 10). With respect to rescheduling the appointment with a specialist, Stowell asserts that it was Palmer who initially refused an orthopedic consult and, thereafter, medical staff provided appropriate treatment; he was not denied an orthopedic

1 consult; and Palmer ultimately saw a specialist and underwent knee surgery (*id.* at 10-11).

Palmer contends that Stowell was deliberately indifferent when she denied his request to transfer to another yard despite Dr. Gibula's recommendation and without personally seeing or evaluating Palmer's condition (Doc. 71 at 14-15, 21). Palmer also alleges that, through his grievances, Stowell was aware of his medical need and the pain he suffered; however, she was indifferent to his pain and disregarded Dr. Gibula's advice based on some unidentified policy that does not permit transfers for medical reasons like his (*id.* at 20-21).

It is undisputed that Dr. Gibula advised Palmer he could move Palmer to a different facility with a more level terrain. The evidence shows, however, that Dr. Gibula was not authorized to move inmates to other facilities (Doc. 71, Ex. 20 (Dec. 24, 2012 appeal resp.) (Doc. 71 at 76)). Rather, inmate housing assignments are based on an inmate's classification and determined by the Offender Services Bureau (Doc. 62, SSOF ¶¶ 1-3). Palmer does not allege that the medical staff at the Winslow Complex was unequipped to treat his knee condition, and the record supports that he received adequate treatment, including outside assessments and specialist care. Under these circumstances, Dr. Gibula's suggestion that Palmer move to another facility was not akin to a physician's recommendation for specific treatment, i.e., for medication or surgery, and Stowell's failure to follow through on Dr. Gibula's misadvisement does not give rise to a constitutional claim. *Cf. Snow v. McDaniel*, 681 F.3d 978, 988 (9th Cir. 2012) (where the treating physician recommended surgery, a reasonable jury could conclude that it was medically unacceptable for the non-treating physicians to deny recommendations for surgery), *overruled in part on other grounds by*, *Peralta v. Dillard*, 744 F.3d 1076, 1082-83 (9th Cir. 2014).

There is no question that Dr. Gibula's misinformation led to Palmer cancelling his orthopedic consult in July 2012 and caused a delay in ultimately seeing a specialist. Given that prison officials acknowledged Palmer was misinformed by Dr. Gibula and

partially upheld his final appeal for this reason, Stowell's grievance response to Palmer—that it was unfortunate he canceled his appointment but that it was "his choice"—misconstrued the facts and was not tactful. But a mistake or even unprofessional conduct does not rise to a constitutional violation.

The medical records show that after Palmer learned in August/September 2012 that he could not transfer to another facility, he continued to see medical staff regularly—almost monthly—for his knee condition (*id.*, SSOF ¶¶ 37, 40, 44, 46-48, 53-54). The ongoing treatment during this time included medications to address his pain, muscle exercises, and issuance of a knee brace and knee sleeve (*id.*). Notably, the August 23, 2012 medical record documents that Palmer told Dr. Gibula he did not want surgical intervention; thus, the conservative treatment was in line with Palmer's expressed desire to avoid surgery (Doc. 22, Ex. 18 (Doc. 62-1 at 50)). Finally, however, in March 2013, an orthopedic consult was requested for an MRI, which occurred in May 2013, and which led to another orthopedic consult for a specialist appointment in June and surgery in July 2013 (*id.* ¶¶ 57, 59, 61; Doc. 60, RSOF ¶¶ 40-45). There is no evidence of an orthopedic consult request prior to March 2013 that Stowell interfered with or denied.

On this record, the Court finds no genuine issue of material fact to support that Stowell was deliberately indifferent to Palmer's serious medical need; thus, her request for summary judgment on Count I will be granted. Stowell's remaining arguments for summary judgment need not be addressed.

The Court notes that in her motion, Stowell appears to request attorney's fees under 42 U.S.C. § 1988 (Doc. 61 at 13).[8] Under § 1988, a district court may award attorney's fees to a prevailing defendant if the plaintiff's underlying claim is frivolous, unreasonable, or without foundation. *Vernon v. City of L.A.*, 27 F.3d 1385, 1402 (9th Cir. 1994). This standard "is applied with particular strictness in cases where the plaintiff

---

[8] The section pertaining to attorney's fees is mistitled "*Palmer* is entitled to her reasonable attorneys' fees incurred in defending this case" (Doc. 61 at 13) (emphasis added). The section proceeds to argue for recovery of attorney's fees incurred in defending against a different plaintiff's claims (*id.*).

- 13 -

1 proceeds pro se." *Miller v. L.A. Cnty. Bd. of Educ.*, 827 F.2d 617, 620 (9th Cir. 1987). Palmer's claim was not frivolous, unreasonable, or without foundation; indeed, the Court screened his Amended Complaint and found that the allegations sufficiently stated a constitutional claim against Stowell (Doc. 13). Her request for attorneys' fees will therefore be denied.

### 2. Ryan

There is no respondeat superior liability under § 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-92 (1978). Therefore, as a supervisor, Ryan may be liable for an Eighth Amendment violation only if he participated in or directed the violation or he knew of the violation and failed to act to prevent it. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

Ryan asserts that Palmer cannot show that he was aware of a substantial risk of harm to Palmer's health (Doc. 59 at 12). Ryan avers that he is not a medical provider and does not prescribe treatment and that he had no involvement with Palmer's transfer from the Lewis Complex to the Winslow Complex in May 2012 (Doc. 60, Ex. B, Ryan Decl. ¶¶ 9, 11 (Doc. 60-1 at 23-24)). Ryan states that both inmate medical care and inmate classification/assignments are duties delegated, pursuant to state law, to the Health Services and Offender Operations Division Directors respectively (*id.* ¶¶ 4-6). Lastly, Ryan asserts that his sole involvement in this case is Palmer's final grievance appeal to the Director, which was responded to by Deputy Director Hood and which, according to Ryan, does not amount to active unconstitutional behavior under § 1983 (Doc. 59 at 13, citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

In his response memorandum, Palmer argues that Ryan's involvement includes both his response to the grievance appeal and his policies and practices (Doc. 71 at 5, 16). He contends that Ryan has a policy of failing to provide prisoners adequate healthcare (*id.* at 13). According to Palmer, when he first saw a prison physician, Dr. Macabuhay, in November 2010 after injuring his knee, Dr. Macabuhay told him that the ADC had a policy and practice of denying knee operations (*id.*). Palmer identifies five significant

"failures" in his treatment that resulted from the alleged unconstitutional policy: (1) the initial failure to take x-rays ordered by Dr. Macabuhay; (2) Palmer's transfer in May 2012 to Winslow before he saw an outside specialist; (3) Stowell's finding that Palmer's placement on the Winslow yard was appropriate; (4) Stowell's failure to take Dr. Gibula's advice that Palmer should be moved; and (5) Ryan's failure to transfer Palmer (*id.* at 13-16). Palmer alleges that Ryan effectively approved all of these failures and deprived Palmer adequate care when he responded to Palmer's final appeal (*id.* at 16). Palmer notes that the final appeal response directed that he be seen by a provider within 30 days; according to Palmer, this is evidence that Ryan had the power to intervene and direct appropriate medical care (*id.* at 16-17). Palmer further alleges that Ryan established the Offender Services Bureau policy and that the failure to take into account Palmer's medical condition, pursuant to that policy, was clearly unreasonable (*id.* at 19).

To the extent Ryan argues that he is not liable because his only involvement was in the grievance process, he overstates the holding of *Shehee*, a Sixth Circuit opinion. Whether involvement in the grievance process is sufficient personal involvement to state a claim of a constitutional deprivation would depend on several factors, such as whether, at the time of the grievance response, the violation is ongoing, *see e.g.*, *Flanory v. Bonn*, 604 F.3d 249, 256 (6th Cir. 2010), or the unconstitutional conduct is completed, *see Shehee*, 199 F.3d at 300, and whether the defendant responding to the grievance has authority to take action to remedy the alleged violation, *see Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009). Further, under Sixth Circuit law, liability under § 1983 requires "active unconstitutional behavior; failure to act or passive behavior is insufficient." *King v. Zamiara*, 680 F.3d 686, 706 (6th Cir. 2012). But under Ninth Circuit law, a defendant can be liable for the failure to act. *See Taylor*, 880 F.2d at 1045.

Nonetheless, in this case, Ryan did not actually respond to or sign Palmer's final appeal response. Even assuming Ryan was aware of Palmer's appeal, because Ryan is not a physician, it was appropriate for him to rely on the Deputy Director's investigation and review of medical records when responding to Palmer's medical complaint. *See*

*Peralta*, 744 F.3d at 1087 (defendant not aware of risk of harm where he was not a dentist, he did not independently review medical chart before signing off on appeal and had no expertise to contribute to a review, and he relied on dental staff who investigated the plaintiff's complaints). As discussed above, the medical records show that Palmer received consistent and adequate medical care for his knee in 2012 and 2013, including medications, knee sleeves, and MRIs and other assessments.

It was also reasonable for Ryan to rely on information from the Offender Services Bureau, which determined that there was no record of any medical issue that would restrict Palmer's housing assignment (Doc. 19, Ex. A, Mata Decl. ¶ 5 (Doc. 19-1 at 2)). Palmer does not demonstrate that he was qualified under the Americans with Disabilities Act for accommodations. More importantly, in his deposition, Palmer conceded that Ryan did not personally know about his bad knee (Doc. 60, Ex. J, Palmer Dep. 28:17-25, Jan. 8, 2014) (Doc. 60-2 at 103)).

On this record, there is no evidence that Ryan had the requisite knowledge of a substantial risk of harm to Palmer's health; thus, he cannot be liable in his individual capacity for deliberate indifference. *See Farmer*, 511 U.S. at 837 (a prison official cannot be liable under the Eighth Amendment "unless the official knows of and disregards an excessive risk to inmate health or safety").

Palmer alleges, however, that Ryan is liable in his official capacity for enacting policies that led to the alleged deliberate indifference. The requisite elements of a § 1983 claim based on a policy, practice, and custom are that: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001).

The Court has determined that neither Stowell nor Ryan's actions amounted to a violation of Palmer's constitutional rights and that Palmer received adequate medical care for his knee condition. As a result, Palmer cannot satisfy the first element required to

establish a § 1983 claim based on an unlawful policy or practice. In addition, although Palmer argues generally that the policies governing medical care and the Offender Services Bureau were deficient, he fails to present evidence of any specific policy, rule, or regulation promulgated by Ryan. Palmer's conclusory allegations that Ryan has a policy of failing to provide adequate health care and that there is a practice of denying knee operations are insufficient to preclude summary judgment. *See Taylor*, 880 F.2d at 1045. Accordingly, Ryan is not liable for a constitutional violation stemming from a policy or practice. The Court will grant summary judgment to Ryan on Count II, and the remaining arguments need not be addressed.

**IT IS ORDERED**:

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendant Ryan's Motion for Summary Judgment (Doc. 59) and Defendant Stowell's Motion for Summary Judgment (Doc. 61).

(2) Defendant Ryan's Motion for Summary Judgment (Doc. 59) is **granted**; Count II is dismissed with prejudice.

(3) Defendant Stowell's Motion for Summary judgment (Doc. 61) is **granted in part** and **denied in part** as follows:

    (a) the Motion is **granted** as to Count I, and Count I is dismissed with prejudice; and

    (b) the Motion is **denied** as to the request for attorneys' fees under 42 U.S.C. § 1988.

(4) The Clerk of Court must enter judgment accordingly and terminate the action.

Dated this 6th day of November, 2014.

Honorable Steven P. Logan
United States District Judge